**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RED LAKE BAND OF CHIPPEWA INDIANS**, | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-0063-RCL |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES**, *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION**</u>

The Red Lake Band of Chippewa Indians is a federally recognized Indian tribe located in Minnesota.  Pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA), the Indian Health Service (IHS), part of the U.S. Department of Health and Human Services (HHS), agreed to contract with the Tribe for the Tribe to carry out Indian health service programs. To facilitate these services, the Tribe constructed the Obaashiing Chemical Health Treatment Center, which it financed partly with its own funds but mostly with a loan from the U.S. Department of Agriculture (USDA).  Although the parties agreed on two annual funding agreements for the Treatment Center—"leases," in the nomenclature of ISDEAA—they could not agree on the amount of compensation owed to the Tribe by the agency.  The Tribe brought suit against HHS and its Secretary, Xavier Becerra, seeking a declaratory judgment that it is entitled to lease compensation for both (1) principal and interest paid or accrued on the USDA loan and (2) depreciation based on the *entire* acquisition cost of the Treatment Center (including both the portion paid by the Tribe itself and that financed by the USDA loan).  It also requests an injunction compelling the Secretary to include both elements in lease compensation for the Treatment Center as well as money damages.

Before the Court are the defendants' motion to dismiss, the Tribe's motion for summary judgment, and the defendants' cross-motion for summary judgment. This case turns on whether the Tribe's proposed compensation for its principal and interest payments and for depreciation are duplicative, which would violate 25 C.F.R. § 900.70. The Court concludes that to the extent depreciation is based on the portion of the facility's acquisition cost funded by the USDA loan, these elements are duplicative because they would serve the same purpose and share the same effect of compensating the Tribe for the actual cost of the Treatment Center. IHS' partial declinations were therefore consistent with the law.

Accordingly, the Court will **GRANT** the defendants' cross-motion for summary judgment and **DENY** the Tribe's motion for summary judgment. The Court will also **DENY AS MOOT** the defendants' motion to dismiss.

## I.  BACKGROUND

The Court will first discuss the statutory and regulatory background to this case, before turning to the facts of this specific dispute.

### A. Statutory and Regulatory Background

"Congress enacted the Indian Self-Determination and Education Assistance Act ('ISDEAA') to help Indian tribes assume responsibility for programs or services that a federal agency would otherwise provide to the tribes' members." *Navajo Nation v. United States Dep't of Interior* (*Navajo Nation I*), 852 F.3d 1124, 1126 (D.C. Cir. 2017) (citing 25 U.S.C. §§ 5301 *et seq.*). Under ISDEAA, a federal agency "must, upon a tribe's request, enter a self-determination contract under which the tribe assumes control over federally funded programs formerly administered by the federal government." *Navajo Nation v. United States Dep't of Interior* (*Navajo Nation II*), 57 F.4th 285, 289 (D.C. Cir. 2023) (citing 25 U.S.C. § 5321(a)(1) and *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 252 (2016)). For instance, IHS

may deliver health care services to American Indians by contracting with tribes or tribal organizations to enable them to operate services IHS would otherwise provide itself. *See* Compl. Ex. A 2, ECF No. 1-1 ("2020–2021 Rejection Letter"); *see also* 25 U.S.C. §§ 1601 *et seq.*

The applicable funding level for a self-determination contract "is determined each year through 'annual funding agreements' (AFAs), which 'represent[] the negotiated agreement of the Secretary to fund, on an annual basis, the programs, services, activities and functions transferred to an Indian tribe . . . under the [ISDEAA].'" *Navajo Nation II*, 57 F.4th at 289 (alteration in original) (citing 25 C.F.R. § 900.6 and 25 U.S.C. §§ 5368(c)(1), 5363(b)(1)).  To negotiate an AFA, a tribe first proposes terms to the Secretary, which the Secretary must approve within ninety days unless he or she "clearly demonstrates" or supports with "controlling legal authority" that at least one specified criterion for declining the terms is met. *Id.* (citing 25 U.S.C. § 5321(a)(2) and 25 C.F.R. § 900.22).  One such ground is that the amount of funds requested by the tribe "is in excess of the applicable funding level for the contract." 25 U.S.C. § 5321(a)(2)(D).  In the event a tribe's funding request is denied, "the tribe may challenge that declination in federal court." *Navajo Nation II*, 57 F.4th at 290 (citing 25 U.S.C. § 5331(a)).

The method of funding relevant to this case is a "lease" under 25 U.S.C. § 5324(*l*), known as a "§ 105(*l*) lease."  The subsection provides:

> **(1)** Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by the Indian tribe or tribal organization for the administration and delivery of services under this chapter.

> **(2)** The Secretary shall compensate each Indian tribe or tribal organization that enters into a lease under paragraph (1) for the use of the facility leased for the purposes specified in such paragraph. Such compensation may include rent, depreciation based on the useful life of the facility, principal and interest paid or accrued, operation and maintenance expenses, and such other reasonable expenses that the Secretary determines, by regulation, to be allowable.

25 U.S.C. § 5324(*l*).  "Section 105(l) leases are not traditional leases" but instead "are facility cost agreements that compensate the tribal owner for expenses associated with using the facility to administer or deliver contracted services."  Pl.'s MSJ 2; *see also* 25 C.F.R. §§ 900.69–74.  So, although the agency neither occupies nor operates the facility, it pays at least some compensation under a "lease" agreement.  *Jamestown S'Klallam Tribe v. Azar*, 486 F. Supp. 3d 83, 85 (D.D.C. 2020).

The statute provides that lease "compensation may include" certain cost elements "and such other reasonable expenses that the Secretary determines, by regulation, to be allowable."  25 U.S.C. § 5324(*l*)(2).  The governing regulation offers further detail about the potential elements of compensation:

> To the extent that no element is duplicative, the following elements may be included in the lease compensation: (a) Rent (sublease); (b) Depreciation and use allowance based on the useful life of the facility based on acquisition costs not financed with Federal funds; (c) Contributions to a reserve for replacement of facilities; (d) Principal and interest paid or accrued; (e) Operation and maintenance expenses, to the extent not otherwise included in rent or use allowances . . .; (f) Repairs to buildings and equipment; (g) Alterations needed to meet contract requirements; (h) Other reasonable expenses; and (i) The fair market rental for buildings or portions of buildings and land, exclusive of the Federal share of building construction or acquisition costs, or the fair market rental for buildings constructed with Federal funds exclusive of fee or profit, and for land.

25 C.F.R. § 900.70.  One of the few district courts to have considered § 105(*l*) leases "offered two principles drawn from section 105(*l*) and the implementing rules: IHS need not grant lease 'compensation requests that [are] "duplicative" [of funding already provided by the government] . . . or [are] not "reasonable."'"  *Jamestown S'Klallam Tribe*, 486 F. Supp. 3d at 85 (alteration in original) (quoting *Maniilaq Ass'n v. Burwell* (*Maniilaq II*), 170 F. Supp. 3d 243, 255 (D.D.C. 2016)).

**B. Factual and Procedural Background**

The Red Lake Band of Chippewa Indians is a federally recognized Indian tribe whose reservation is located in Minnesota.  Compl. ¶ 2, ECF No. 1.  Pursuant to ISDEAA, the Tribe contracts with IHS to operate health programs, including a contract for an alcohol program and a contract for a substance abuse and rehabilitation program.  *Id.* ¶ 7.  To help support the operation of those two programs, the Tribe constructed the Obaashiing Chemical Health Treatment Center between 2018 and 2020.  *Id.* ¶ 8.  It financed construction from two sources: $856,493 of its own funds plus $4,950,000 loaned by USDA.  *Id.* ¶ 9.

Having completed the Treatment Center, the Tribe on August 31, 2020 submitted a proposal to IHS for the agency to lease the facility pursuant to 25 U.S.C. § 5324(*l*).  *Id.* ¶ 10. Because the Tribe began providing services at the Treatment Center in December 2020, the parties agreed to enter into a prorated one-month lease for December 2020 as well as a 12-month lease for calendar year 2021.  *Id.* ¶¶ 11–12.  The parties could not agree, however, on the elements of compensation for these two leases.  In an October 29, 2020 letter, IHS explained one reason for why it would partially decline the Tribe's proposed funding:

> the depreciation element of compensation provides the Nation with compensation for the total cost of the [Obaashiing Chemical Health Treatment Center]. Yet, the Nation seeks also to charge IHS under the principal and interest element for each and every principal and interest payment made by the Nation on its construction loan. These elements, therefore, provide compensation for the exact same thing - the cost of the [Treatment Center] (plus interest).

Defs.' MSJ, Ex. C ("Oct. 29, 2020 Letter") 3–4, ECF No. 22-5.  IHS stated that "these elements are impermissibly duplicative, and IHS cannot agree to the proposed level of compensation." *Id.* 3 (citing 25 C.F.R. § 900.70).

Ultimately, IHS issued a rejection letter that omitted this duplication argument but listed several other rationales for partially declining the Tribe's proposed funding.  *See* 2020–2021

5

Rejection Letter 5–9.  IHS concluded that the Tribe was not entitled to $136,186.29 for the annual principal and interest payments owed by the Tribe on the USDA loan, and therefore declined to compensate the Tribe for this amount pursuant to 25 U.S.C. § 5321(a)(2)(D).  *Id.* 5–6; Compl. ¶ 13.  With principal and interest omitted, IHS did not dispute the other elements, including depreciation based on the full acquisition cost of the Treatment Center.  Compl. ¶ 13.  IHS thus agreed to enter one lease for December 2020 for $63,648 and another lease for 2021 for $763,770, declining the Tribe's proposals to the extent they sought greater amounts.  *Id.* ¶ 15.

In 2022, the Tribe submitted its lease proposal for that year.  *Id.* ¶ 16.  The parties again disagreed on the proper amount of compensation.  This time, the defendants agreed to compensate the Tribe for principal and interest on the USDA loan.  *Id.* ¶ 19.  The point of contention now was whether the Tribe was entitled to compensation for depreciation of the entire purchase price of the facility.  The Tribe's proposed lease compensation included $145,268.80 for depreciation of the Treatment Center, "based on its full acquisition cost of $5,806,493.50 amortized over a 39-year useful life."  Pl.'s Statement of Material Fact ¶ 17, ECF No. 15-2.  To be clear, IHS agreed to pay depreciation for the portion of the acquisition cost covered by the Tribe's own funds.  *See* Compl. ¶ 22.  But it rejected paying the Tribe for the amount of depreciation attributed to the portion of the acquisition cost covered by the USDA loan.  *Id.* ¶ 23.  IHS thus decreased the lease compensation by $123,307.80, agreeing to lease compensation of $648,709, but denying the Tribe's proposal for more.  *Id*.  ¶¶ 18, 23.

IHS explained that it was reducing the proposed compensation for depreciation for two reasons.  First, the proposal violated the requirement of 25 C.F.R. § 900.70(b) that depreciation must be "based on the useful life of the facility based on acquisition costs not *financed with Federal funds*."  Compl., Ex. B 5–7, ECF No. 1-2 ("2022 Rejection Letter") (emphasis added).  Second,

the depreciation for the entire cost of the facility was duplicative of the principal and interest owed to USDA.  *Id.* 5–6 ("[B]y asking the IHS to pay depreciation . . . as well as principal and interest on the construction loan, the Nation is asking the IHS to buy the building twice.").   In light of these reasons, IHS stated that since this time it was including the principal and interest in the lease compensation, it would reduce the lease compensation by the amount of depreciation attributed to the portion of the acquisition cost funded by the USDA loan, $123,307.80.  *See id.* 6–7; Compl. ¶¶ 20, 23.

In response to IHS' partial declinations for December 2020, 2021, and 2022, the Tribe has sought judicial review in this district pursuant to 25 U.S.C. § 5331(a) and 28 U.S.C. § 1331.  *See* Compl. ¶ 5.  The Tribe seeks a declaratory judgment that it is entitled to lease compensation that includes *both* depreciation based on the full acquisition cost of the Treatment Center *and* the principal and interest paid or accrued on the USDA loan.  *Id.* ¶¶ 26–27.  The Tribe also seeks an injunction requiring the Secretary of HHS to provide lease compensation that includes both elements, *id.* ¶ 29, as well as money damages amounting to $11,349 for 2020, $136,186 for 2021, and $123,308 for 2022, *id.* ¶ 31.

The defendants moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  *See* MTD, ECF No. 13.  The Tribe filed a combined opposition and motion for summary judgment.  *See* Pl.s' MSJ & Opp'n to MTD ("Pl.'s MSJ"), ECF No. 15-1.  Defendants then filed their own motion for summary judgment, opposition to plaintiff's motion for summary judgment, and reply in support of the motion to dismiss.  Defs.' MSJ, ECF No. 22.  The Tribe filed a combined reply in support of its motion for summary judgment and opposition to defendants' motion for summary judgment.  *See* Pl.'s Reply in Support of MSJ & Opp'n to Defs.' MSJ ("Pl.'s

Reply"), ECF No. 25.  Finally, defendants filed a reply in support of their motion for summary

judgment.  Defs.' Reply in Support of MSJ ("Defs.' Reply"), ECF No. 26.

These motions are now ripe for review.

## II.   LEGAL STANDARDS

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

A defendant in a civil action may move to dismiss a complaint under Federal Rule of Civil

Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  *See* Fed. R.

Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual

allegations, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A court

evaluating a Rule 12(b)(6) "motion presumes that the complaint's factual allegations are true and

construes them liberally in the plaintiff's favor."  *Alemu v. Dep't of For-Hire Vehicles*, 327 F.

Supp. 3d 29, 40 (D.D.C. 2018).  However, "[a] court need not accept a plaintiff's legal conclusions

as true, . . . nor must a court presume the veracity of legal conclusions that are couched as factual

allegations."  *Id.* (citation omitted).

Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under Rule 12(b)(6)

or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion

must be treated as one for summary judgment under Rule 56" and that "[a]ll parties must be given

a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ.

P. 12(d).  When a court is faced with both a motion to dismiss and a motion for summary judgment,

"if the outside matter introduced for purposes of the summary judgment motion is utilized by the

district court to dispose of the motion to dismiss, the latter must be converted into a motion for

summary judgment by following the terms of Rule 12(d)."  5C Wright & Miller, Fed. Prac. & Proc. Civ. § 1366 (3d ed. Feb. 2024 update); *see also Richardson v. Rivers*, 335 F.2d 996, 998 (D.C. Cir. 1964) (holding that when the district court uses matter outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment).

### B.  Summary Judgment Under Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must thus determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

### C.  Standard of Review Under ISDEAA

When reviewing factual questions under ISDEAA, "the agency bears 'the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer.'"  *Jamestown S'Klallam Tribe*, 486 F. Supp. 3d at 87 (quoting 25 U.S.C. § 5387(d)).  As for legal questions, the parties agree that the proper standard of review is de novo.  *See* Pl.'s MSJ 5; Defs.' MSJ 5; *see also Jamestown S'Klallam Tribe*, 486 F. Supp. 3d at 87; *Maniilaq II*, 170 F. Supp. 3d at 247; *Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 542 (D.D.C. 2014).

An additional consideration when a court interprets ISDEAA is that it must employ a rule of construction in favor of Indian tribes.  It is an established canon of interpretation that statutes must "be construed liberally in favor of the Indians."  *Fort McDermitt Paiute & Shoshone Tribe*

*v. Becerra*, 6 F.4th 6, 14 (D.C. Cir. 2021) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). ISDEAA "codified" this canon. *Fort McDermitt Paiute & Shoshone Tribe*, 6 F.4th at 14 (citing 25 U.S.C. § 5392(f)).

Notably, "[a]s codified in [ISDEAA], the canon applies only when a statute is ambiguous." *Fort McDermitt Paiute & Shoshone Tribe*, 6 F.4th at 14 (citing 25 U.S.C. § 5392(f)).[1] When the canon applies, it can trump the deference ordinarily accorded to agency interpretation under *Chevron* and its progeny. *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001). "Therefore, even where the ambiguous statute is one entrusted to an agency, we give the agency's interpretation 'careful consideration' but 'we do not defer to it.'" *Id.* at 1101 (quoting *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n.8 (D.C. Cir. 1988)). Of course, application of this canon "'need not be conclusive' on the issues before the Court, and the canon's force may be overcome by 'other circumstances evidencing congressional intent.'" *Maniilaq II*, 170 F. Supp. 3d at 248 (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001)).

## III.   DISCUSSION

The central question in this case is whether the Tribe's compensation proposals for (1) the principal and interest on the USDA loan used to build the Treatment Center and (2) depreciation based on an amount that includes the portion of the acquisition cost funded by that loan are duplicative, in violation of 25 C.F.R. § 900.70. The answer is yes.[2]

---

[1] The Tribe contends that even unambiguous provisions of ISDEAA must be liberally construed in favor of the Tribe. *See* Pl.'s MSJ 12 (citing *Navajo Health Foundation-Sage Memorial Hosp., Inc. v. Burwell*, 263 F.Supp.3d 1083, 1105 (D.N.M. 2016)). But whatever the merits of that approach as a matter of first impression, it is foreclosed by the D.C. Circuit's explanation that "[a]s codified in [ISDEAA], the canon applies only when a statute is ambiguous." *Fort McDermitt Paiute & Shoshone Tribe*, 6 F.4th at 14 (citing 25 U.S.C. § 5392(f)).

[2] The Court will not reach the issue of whether compensation for depreciation would be barred by 25 C.F.R. § 900.70(b)'s requirement that depreciation be "based on the useful life of the facility based on acquisition costs not financed with Federal funds." The Tribe challenges not just the applicability of this provision, but also its consistency with 25 U.S.C. § 5324(*l*). *See* Pl.'s MSJ 9–15; Pl.'s Reply 9–13. But "precedent and prudence counsel" courts "to avoid unnecessary dicta." *Louisiana Env't Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996). The

### A.  The Tribe's Proposed Lease Compensation Would Be Duplicative

Before the Court can consider whether the Tribe's proposals would be impermissibly duplicative, the Court must address whether the defendants may appropriately defend IHS' 2020–2021 and 2022 Rejection Letters on this basis, even though the duplication rationale was absent from the 2020–2021 Rejection Letter and is apparently at odds with the interpretation of another agency.  But these purported obstacles do not preclude the Court from affirming IHS' rejections letters based on the duplication rationale.  And on the merits, the Tribe's requests to be compensated for both the principal and interest on the USDA loan used to build the Treatment Center and depreciation based on the portion of the acquisition cost funded by that loan would twice compensate it for the same thing.  The Tribe's proposals were therefore duplicative, in violation of 25 C.F.R. § 900.70.

### 1.  Defendants Are Not Barred From Partially Declining the Tribe's Proposals as Duplicative

The defendants are not precluded from relying on 25 C.F.R. § 900.70's exclusion of duplicative elements.  The Tribe does not challenge the validity of this provision.  The Tribe does, however, advance two arguments for why IHS cannot partially decline the Tribe's proposals on this basis.  First, the Tribe argues that because IHS did not cite duplication in the 2020–2021 Rejection Letter, ISDEAA bars it from belatedly defending the 2020–2021 decision on that basis. That argument also raises the question of whether affirming the 2020–2021 Rejection Letter based on a rationale absent from that document would violate the *Chenery* principle of administrative law.  Second, the Tribe contends that IHS' duplication reasoning impermissibly conflicts with the interpretation of the Bureau of Indian Affairs (BIA).  Neither objection withstands careful scrutiny.

---

Court will not grapple with the validity of this regulation when it can decide the case on the basis of another, undisputedly valid provision of the same regulation: the prohibition on duplicative cost elements.

(i) *IHS' 2020–2021 Rejection Letter May Be Upheld on the Basis of the Duplication Argument*

Although IHS did not cite the duplication rationale in its 2020–2021 Rejection Letter, defendants' reliance on the duplication argument is consistent with both ISDEAA and the *Chenery* principle of administrative law.  The agency complied with ISDEAA's notification requirement because it timely notified the Tribe of its duplication reasoning, which the statute does not require to be provided in the final agency decision itself.  And this case falls within an exception to the *Chenery* principle so long as the duplication argument is clearly correct.

 The parties dispute the significance of IHS' omission of the duplication rationale from the 2020–2021 Rejection Letter.  The Tribe argues that IHS cannot defend its partial declination for December 2020 and calendar year 2021 on the basis of duplication, and must therefore grant in full its lease compensation requests for those periods.  *See* Pl.'s MSJ 16–17; Pl.'s Reply 13–15.  According to the Tribe, because IHS omitted the duplication argument from its 2020–2021 Rejection Letter, the agency revised its reasoning after the fact and so failed to fulfil its "role of making defensible 90-day funding determinations when assessing contract proposals."  Pl.'s Reply 14 (quoting *Cook Inlet Tribal Council v. Mandregan*, No. 14-cv-1835 (EGS), 2019 WL 3816573, at *10 (D.D.C. Aug. 14, 2019)).  The defendants counter that the agency satisfied the notification requirement with its October 29, 2020 Letter, in which IHS reasoned that the Tribe's proposed compensation for both depreciation and loan payments was impermissibly duplicative under 25 C.F.R. § 900.70.  *See* Defs.' MSJ 23–24; Defs.' Reply 9–12; *see also* Oct. 29, 2020 Letter 3–4.

The Court finds that IHS' reliance on the duplication argument is consistent with ISDEAA.  The Tribe emphasizes that the letter containing the duplication reasoning "was not the agency's final action."  Pl.'s Reply 15.  But nothing in 25 U.S.C. § 5321(a)(2) requires the legal grounds for declination to be in the agency's final decision itself, as opposed to an earlier communication to

the tribe. ISDEAA provides that "the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that" one of five specified grounds for declination applies. § 5321(a)(2). The statute does not specify the *form* the "written notification" must take. Although the Court will liberally construe § 5321(a)(2) in favor of the Tribe, it cannot graft onto the statute an additional requirement that this notification must be contained in the agency's final decision. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 94 (2012)). Therefore, when IHS issued its October 29, 2020 Letter, it provided timely "written notification" to the Tribe containing "a specific finding . . . that is supported by controlling legal authority" that the Tribe's lease proposal would be duplicative and thus excessive. In other words, IHS complied with the letter of the law.

Upholding IHS's 2020–2021 Rejection Letter would not violate the *Chenery* principle of administrative law, provided the Court concludes that the duplication rationale is clearly correct. According to this rule, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). Although the Tribe did not raise a *Chenery* argument, the

defendants' request for affirmance based on a reason not in the decision itself compels the Court to consider whether that would violate *Chenery*.

Setting aside for the moment any exceptions, the defendants' reliance on a rationale absent from the decision itself arguably poses a problem under *Chenery*. On the one hand, one could argue that IHS cannot defend its declination decisions on a basis initially raised by the agency but then omitted from its actual decision. *See Nat'l Fed'n of Fed. Emps., Loc. 1669 v. Fed. Lab. Rels. Auth.*, 745 F.2d 705, 708 (D.C. Cir. 1984) ("It is a long-established principle of administrative law that the agency must explain its reasons *in its decision*, rather than in counsel's post hoc rationalizations.") (emphasis added). On the other hand, perhaps it suffices that IHS raised the duplication argument during the process of rendering a final decision. *See Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 835 (D.C. Cir. 2000) (suggesting that an agency's argument would be a post hoc rationalization because the agency "did not rely upon it or even discuss it during the rulemaking process as the basis for its decision"). Although this reason did not surface in the decision itself, it was present in the decision-making process and did not emerge for the first time as a post hoc rationalization or litigating position.

In any event, even if the agency's basis must be included in the final decision itself, an exception to the *Chenery* principle could permit the Court to consider the duplication argument. The *Chenery* principle has a "limited exception." *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011). Even "[w]hen an agency raises a purely legal argument for the first time in litigation, a court may consider that argument if it is both clearly correct and would render remand pointless under the harmless error standard." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 303–04 (D.C. Cir. 2022); *see also Envirocare of Utah, Inc. v. U.S. Nuclear Regul. Comm'n*, 194 F.3d 72, 79 (D.C. Cir. 1999) ("As Judge Friendly explained, reversal and

14

remand is 'necessary only when the reviewing court concludes that there is a significant chance that but for the error the agency might have reached a different result.'" (quoting Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 211 (1969))).

Assuming for now that the duplication reasoning is clearly correct, that exception applies here. It would be "pointless under the harmless error standard," *Oglala Sioux Tribe*, 45 F.4th at 304, to remand the matter to the agency to reconsider the 2020–2021 proposals in light of reasons omitted from the 2020–2021 Rejection Letter but included in a written notification per ISDEAA. In the 2022 Rejection Letter and in this litigation, the defendants have embraced the duplication reasoning, and would presumably do so again. The substantive result on remand would be unaffected, since in both the 2020–2021 and 2022 Rejection Letters, defendants "offered to pay for the acquisition costs for the given year." Defs.' MSJ 23. Also, the 2020–2021 Rejection Letter is consistent with the position that depreciation and loan payments duplicate each other. IHS presumably omitted the duplication ground not because it changed its mind but because the duplication concern was essentially mooted by IHS' exclusion of loan payments for other reasons. Had IHS determined in 2021, as it did the following year, that loan payments were compensable, it presumably would have renewed its reliance on duplication. *See* 2022 Rejection Letter 4 ("The IHS has revisited its position and has negotiated the inclusion of principal and interest in the Nation's calendar year 2022 lease, subject to any necessary corresponding changes to the depreciation element caused by the inclusion of principal and interest.").

Since the agency's omission of the duplication argument "clearly had no bearing on the procedure used or the substance of decision reached . . . the sought extension of [*Chenery* and its progeny] would not advance the purpose they were intended to serve." *See Massachusetts Trustees*

*of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964). "To remand would be an idle and useless formality" because *Chenery* "does not require that we convert judicial review of agency action into a ping-pong game." *NLRB. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (plurality). Therefore, neither ISDEAA nor *Chenery* necessarily preclude the Court from considering defendants' duplication argument.

*(ii) IHS Is Not Foreclosed by Another Agency's Contrary Interpretation*

Next, IHS may take the position that depreciation and loan payments are duplicative despite the apparently contrary interpretation of BIA in a past instance.

The Tribe asserts that BIA took "the opposite position based on the same statute and regulations." Pl.'s Reply 7. In March, 2020—before IHS had issued either of its decisions—BIA entered into a § 105(*l*) lease with the Tribe concerning two fire halls constructed with USDA loans, and BIA agreed to compensate the Tribe for both its loan payments and depreciation based on the entire acquisition cost of the facilities. *Id.*; *see* Pl.'s Statement of Material Facts ¶¶ 20–22; Pl.'s MSJ, Ex. B 1. The Tribe argues that IHS is bound to follow BIA's interpretation because "[m]ultiple D.C. Circuit decisions establish that federal agencies cannot adopt inconsistent interpretations of the same legal requirement." Pl.'s Reply 7. The defendants contend they are not "bound to follow this purported mistake." Defs.' MSJ 22.

In fact, the cases cited by the Tribe do not establish such a broad, categorical rule, nor is the Court familiar with any authority for that proposition. The Tribe claims that "[t]he D.C. Circuit has explicitly held that '[n]o one should face "multiple and perhaps conflicting interpretations of the same requirement,"' as the Tribe does here." Pl.'s Reply 8 (quoting *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 488 (D.C. Cir. 2013)). But the Tribe has wrenched this language from its context. What the D.C. Circuit actually stated was that "[n]o one should face

'multiple and perhaps conflicting interpretations of the same requirement,' . . . *when disobedience may result in imprisonment and million-dollar-a-day penalties*." *DeNaples*, 706 F.3d at 488 (citations omitted) (emphasis added). At any rate, the Tribe's assertion that it is facing conflicting interpretations is open to question. The defendants argue that "Plaintiff has not—and cannot—point to any possibility that any given project would be subject to inconsistent regulations" because "Plaintiff knows that it must negotiate with Bureau of Indian Affairs for the leases for the Fire Halls and with Defendants with respect to the Treatment Center." Defs.' MSJ 23. The Tribe essentially concedes this point by acknowledging it without offering any substantive response. *See* Pl.'s Reply 9.

The other two cases cited by the Tribe are inapposite. They indicate only that when agencies adopt inconsistent interpretations, neither interpretation is entitled to *Chevron* deference. *See Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1287 (D.C. Cir. 1983) (holding that the court was "not bound by the agency's interpretive regulation" because "[a]ny other conclusion would produce an intolerable situation in which different agencies could adopt inconsistent interpretations of the FOIA and substantially complicate the administration of the Act."); *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) (suggesting "that interpretive uniformity across agencies may be important enough to undermine the case for *Chevron* deference to one agency's interpretation."). Here, the question is not whether IHS' view is entitled to deference—it is not, in light of the Indian law canon. *See Cobell*, 240 F.3d at 1101. The issue is whether IHS can properly adopt its own view of 25 C.F.R. § 900.70, regardless of what another agency may have done in a single past decision. The Tribe's attempt to cobble together inapposite cases into a categorical rule fails. Defendants may invoke the duplication argument despite BIA's contrary interpretation.

Since the Court rejects both arguments for why the defendants cannot defend IHS' decisions on the basis of the duplication argument, the Court will proceed to consider the duplication argument on the merits.

### 2.  IHS Is Correct That Depreciation Would Be Duplicative of Principal and Interest

To the extent the Tribe seeks depreciation for the portion of the acquisition cost funded by the USDA loan, the Tribe's proposed compensation elements are duplicative, in violation of 25 C.F.R. § 900.70.  That is because both elements would compensate the Tribe for the actual cost of acquiring the facility.  Just as the loan payment element seeks to recover the cost of building the Treatment Center, so too does the proposed depreciation element serve to recoup the cost of the facility.

The Tribe does not dispute that if its requests for principal and interest and depreciation are "duplicative" in the sense of 25 C.F.R. § 900.70, then partial declination would be appropriate. As discussed above, that regulation governs lease compensation under 25 U.S.C. § 5324(*l*)(2).  It provides in relevant part:

> *To the extent that no element is duplicative*, the following elements may be included in the lease compensation: . . . (b) Depreciation and use allowance based on the useful life of the facility based on acquisition costs not financed with Federal funds; . . . (d) Principal and interest paid or accrued . . . .

25 C.F.R. § 900.70 (emphasis added).  Although the Tribe challenges the validity of § 900.70(b)'s "Federal funds" requirement, it does not challenge the validity of the duplication provision.  *See* Pl.'s MSJ 9–12; Pl.'s Reply 10.  There is no dispute, then, that "IHS need not grant lease 'compensation requests that [are] "duplicative" [of funding already provided by the government] . . . or [are] not "reasonable."'" *Jamestown S'Klallam Tribe*, 486 F. Supp. 3d at 85 (alteration in original) (quoting *Maniilaq II*, 170 F. Supp. 3d at 255).

The question is whether the following cost elements would be duplicative: (1) compensation "to cover annual principal and interest payments owed by the Tribe on the USDA loan," Compl. ¶ 13, and (2) compensation for "depreciation equivalent to the entire purchase price divided into equal parts over 39 years."  Defs.' Statement of Material Facts ¶ 6, ECF No. 22-2; Pl.'s Response to Defs.' Statement of Material Facts ¶ 6, ECF No. 25-1; *see also* Compl. ¶ 21 (explaining that the Tribe sought compensation "for straight-line depreciation of the facility based on its 'book value,' i.e., the acquisition cost of $5,806,493.50, amortized over a 39-year useful life.").  Again, the Tribe is seeking compensation for depreciation based on the full acquisition cost, including both the portion paid by the Tribe and the much greater portion funded by the USDA loan.[3]  Acceding to both proposals in their entirety, the defendants say, would compensate the Tribe "for its acquisition costs twice."  Defs.' MTD 3–4.

The Tribe offers several responses.  First, it argues that the depreciation and principal and interest elements of lease compensation can *never* be duplicative because § 5324(*l*) lists both as distinct expenses.  Pl.'s MSJ 6; Pl.'s Reply 3–4.  That view is inconsistent with the unambiguous statute, however.  Congress' use  of the permissive "may" rather than the mandatory "shall" indicates that the statute enumerates elements that are potentially available depending on the case, rather than universally mandated every time.  This reading of the statute is further evidenced by the inclusion of "principal and interest paid or accrued."  That element cannot be required in every lease because it will not be relevant to some projects, such as a lease of a facility acquired by a tribe without a loan.

---

[3]As noted before, the Tribe financed construction of the facility with $856,493 of its own funds plus $4,950,000 loaned by the USDA.  Compl. ¶ 9.  The defendants do not dispute that the Tribe is entitled to compensation for the amount of depreciation attributed to the portion of the acquisition cost funded by the Tribe itself.  The disagreement is over whether the Tribe is entitled to compensation for the much greater amount of depreciation tied to the acquisition cost funded by the loan.  *See id.* ¶¶ 20, 23; 2022 Rejection Letter 6–7.

Next, the Tribe attempts to establish that depreciation and loan payments cannot be duplicative elements of a § 105(*l*) lease because they are both compensable in certain other contexts. But the provisions cited are of little interpretative help because they differ meaningfully from 25 U.S.C. § 5324(*l*) and 25 C.F.R. § 900.70. Most notably, none include a textual bar on duplicative payments. *See* Pl.'s MSJ 6–7 (citing 49 U.S.C. § 49104(a)(9) (concerning the Metropolitan Washington Airports Authority's lease of the Metropolitan Washington Airports from the Secretary of Transportation); Postal Reorganization Act of 1970, Pub. L. 91-375, 84 Stat. 719, 760 (1970), *previously codified at* 39 U.S.C. § 3621, *repealed by* Pub. L. 109-435, Title II, § 201(a), 120 Stat. 3198, 3200 (2006) (concerning the "total estimated costs" which the United States Postal Service may fund through postal rates and fees); 42 C.F.R. § 413.149(b) (permitting Medicare service providers to depreciate assets "irrespective of the source of the financing of an asset"). And even if the Tribe is correct that in other, quite different contexts, depreciation and loan payments may be distinct costs, that does not change the fact that in *this case*, they may be duplicative in violation of 25 C.F.R. § 900.70.

The Tribe's final argument is that principal and interest and depreciation are simply "distinct costs." Pl.'s MSJ 6. According to the Tribe, principal and interest "are part of the cost of acquiring a capital asset." *Id.* Depreciation, by contrast, is "a decline in an asset's value because of use, wear, obsolescence, or age." *Id.* (quoting *Depreciation*, *Black's Law Dictionary* (11th ed. 2019)). These are conceptually distinct, the Tribe suggests, and for that reason cannot duplicate each other. Of course, these elements are not *inherently* duplicative. But that does not mean they can *never* be duplicative. 25 C.F.R. § 900.70 recognizes that whether elements are duplicative depends on the case, because it lists elements that may be included in lease compensation but only

"[t]o the extent that no element is duplicative."  The Court must consider the cost elements not as abstract Platonic ideals, but as concepts that take definite shape within a real-life case.

Here, the cost elements of principal and interest and depreciation serve the same purpose and share the same effect: compensating the Tribe for the actual cost of the Treatment Center. Compensation for its loan payments enables the Tribe to recover most (not just "part") "of the cost of acquiring" the Treatment Center.  *See* Pl.'s MSJ 6.  The purpose of depreciation as an element of a § 105(*l*) lease is less self-evident.

However, considering both the purpose of compensation for depreciation in the realm of tax law and the context of this case, the Court concludes that the purpose of compensating the Tribe for the Treatment Center's depreciation would be to enable the Tribe to recover the acquisition cost of that facility.  Neither ISDEAA nor the implementing regulations define "depreciation."  However, "depreciation" is a legal term, and "[l]egal terms in a statute have their legal meaning, absent legislative intent to the contrary, or other evidence of a different meaning, such as context or a statutory definition."  2A Shambie Singer & Norman J. Singer, Sutherland Statutes and Statutory Construction § 47:30 (7th ed. Nov. 2023 update) (footnotes omitted); *see also* Scalia & Garner, *supra*, at 73 ("[W]hen the law is the subject, ordinary legal meaning is to be expected[.]").  Here, "depreciation" is a term evidently borrowed from the world of tax law.  It is a "longstanding interpretive principle" that "[w]hen a statutory term is '"obviously transplanted from another legal source,"' it '"brings the old soil with it."'"  *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (citation omitted) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).  To discern the role of "depreciation" in an § 105(*l*) lease, the Court will thus consider the purpose served by depreciation in the tax context— as helpfully elucidated by the Supreme Court.  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)

("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); Scalia & Garner, *supra*, at 322 ("If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort . . . they are to be understood according to that construction."). To discern the role of "depreciation" in a § 105(*l*) lease, the Court will consider the Supreme Court's authoritative construction of depreciation's purpose.

As Justice Harlan paraphrased the Supreme Court's explanation in another case, "the purpose of depreciation is to recover, by the time of an asset's retirement, the original investment therein." *Massey Motors Inc. v. United States*, 364 U.S. 92, 112 (1960) (Harlan, J., dissenting in part and concurring in the judgment in part) (citing *Detroit Edison Co. v. Comm'r*, 319 U.S. 98, 101 (1943)).  Or as Justice Brandeis put it, the depreciation income tax deduction serves to gradually compensate a person for the "original cost" of property acquired.  *See United States v. Ludey*, 274 U.S. 295, 300–01 (1927) ("The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost.").

The function of depreciation is thus to enable one to recover the original cost of an asset over time.  *See Comm'r v. Idaho Power Co.*, 418 U.S. 1, 10–11 (1974) ("[T]he purpose of depreciation accounting is to allocate the expense of using an asset to the various periods which are benefited by that asset.") (quoting *Hertz Corp. v. United States*, 364 U.S. 122, 126 (1960)); *Lenkin v. District of Columbia*, 461 F.2d 1215, 1231 (D.C. Cir. 1972) ("[T]he businessman seeks recoupment of his investment in a depreciable asset by depreciation deductions spread over the

useful lifetime of the asset[.]"); *Gen. Elec. Co. v. Delaney*, 251 F.3d 976, 980 (Fed. Cir. 2001) ("[T]he purpose of depreciation is to allocate the entire historic cost of an asset."); *see also* 48 C.F.R. § 2.101(b) (defining, for purposes of the Federal Acquisition Regulation, depreciation as "a charge to current operations that distributes the cost of a tangible capital asset, less estimated residual value, over the estimated useful life of the asset in a systematic and logical manner"). The purpose of depreciation is not simply to replace one's property but to "replace the original investment therein." *Detroit Edison Co.*, 319 U.S. at 101; *see also Hansen v. City of San Buenaventura*, 42 Cal. 3d 1172, 1194 n.1 (Cal. 1986) ("[M]ost courts reason that the purpose of depreciation is not to replace property but to recover the original investment over the life of the property.").

Depreciation thus serves to compensate for the acquisition cost of the asset. *See Oppenheimer v. District of Columbia*, 363 F.2d 708, 715 n.8 (D.C. Cir. 1966) ("It is not to be supposed that Congress, in allowing deductions of depreciation for tax purposes, intended that a taxpayer should recoup more than his investment in depreciated property." (internal quotation and citation omitted)); *City Nat. Bank Bldg. Co. v. Helvering*, 98 F.2d 216, 220 (D.C. Cir. 1938) (observing that a depreciation deduction "as claimed here is never allowable unless the capital of the claimant has gone into the property."); *see also Stewart v. Stewart*, 793 P.2d 813, 815 (Mont. 1990) ("[T]he purpose of depreciation is to assist a person in *regaining* their expenditures[.]"). These decisions of the Supreme Court, the D.C. Circuit, and other courts show that the settled purpose of depreciation is to recover the original investment in an asset.

Congress incorporated that settled understanding of the term "depreciation" by listing it as a potentially compensable element without signaling any intention that it serve a different purpose. There is no indication in the text of ISDEAA that Congress intended the term to have a different

meaning than that given to it by the Supreme Court in the tax context.  Nor are any such clues

apparent in the legislative history of § 5324(*l*), which was added to the statute in 1994.  *See* Indian

Self-Determination Act Amendments of 1994, Pub. L. 103-413, § 102, 108 Stat. 4250, 4255–56.

The purpose of § 5324(*l*) funds is to "compensate a tribe for the indirect costs of administering a

federal program," *Jamestown S'Klallam Tribe*, 486 F. Supp. 3d at 89, and here the cost to be

compensated for is the "original investment" in the Treatment Center, *Detroit Edison Co.*, 319

U.S. at 101.  The Tribe offers no alternative explanation for the purpose of the depreciation cost

element.[4]

The Tribe is asking IHS to compensate it for both most of what it cost to build the

Treatment Center (principal and interest on the USDA loan) and that same cost spread across the

useful life of the facility (the amount of depreciation attributed to the portion of the acquisition

cost funded by the USDA loan).  But to compensate the Tribe for the same thing twice would

surely be duplicative in the sense of "[h]aving or characterized by having overlapping content,

intentions, or effect."  *Duplicative*, *Black's Law Dictionary* (11th ed. 2019).  Under 25 C.F.R.

§ 900.70, the Tribe is not entitled to lease compensation including both loan payments and

depreciation for the full cost of the facility.

Therefore, the Court concludes that the Tribe's requests were impermissibly duplicative.[5]

---

[4] To be clear, compensating the Tribe for depreciation would *not* serve to cover the cost of upkeep.  Despite what the Tribe's citation to Black's Law Dictionary might suggest, the depreciation cost element does not go directly toward dealing with the "use, wear, obsolescence, or age" of the Treatment Center.  That is because the 2020, 2021, and 2022 leases all involved separate compensation for "funding maintenance (reducing the actual decline in value of the Treatment Center) and contributions to a reserve (prepaying for replacements of parts of the Treatment Center that are expected to wear out quickly)."  Defs.' Reply 1 (citing Pl.'s MSJ Ex. 2 5 and Defs.' MSJ Ex. F 2).

[5] Since defendants' duplication argument is clearly correct, this case falls into the exception to *Chenery* discussed in Section III(A)(1)(i).

**B.  The Court Will Grant Defendants' Motion for Summary Judgment**

Since the defendants are correct that the Tribe's proposed cost elements are duplicative in violation of 25 C.F.R. § 900.70, the Court will deny the Tribe's motion for summary judgment and grant the defendants' motion for summary judgment.

As a preliminary matter, the Court cannot grant defendants' motion to dismiss because resolving this case requires consideration of a matter outside the pleadings.  Specifically, the Court must take note of the October 29, 2020 Letter.  Otherwise, it could not resolve the Tribe's argument that by omitting the duplication argument from its 2020–2021 Rejection Letter, IHS failed to provide written notification for its declination decision as required by 25 U.S.C. § 5321(a)(2). Since the court will consider this outside matter, it will decide this case on the basis of the cross-motions for summary judgment rather than the motion to dismiss.  *Cf. Richardson*, 335 F.2d at 998 (holding that when the district court uses matter outside the pleadings, the motion to dismiss must be treated as a motion for summary judgment).  There is certainly no unfairness in doing so, because both parties have cross-moved for summary judgment, and because both have focused almost entirely on purely legal arguments, without sorting them into separate motion-to-dismiss or summary-judgment buckets.  *Cf. Maldonado v. District of Columbia*, 924 F. Supp. 2d 323, 328 (D.D.C. 2013) (noting that in deciding whether to convert a motion to dismiss to a motion for summary judgment, "the touchstone is fairness and whether consideration of summary judgment is appropriate, in light of the nature of the extra-pleading material submitted, the parties' access to sources of proof, and the parties' concomitant opportunity to present evidence in support or opposition to summary judgment.").

The Court will grant defendants' motion for summary judgment, and deny the Tribe's motion for summary judgment, because there is no genuine dispute as to any material fact and the

defendants are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The parties do not dispute any "facts that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248; *see* Pl.'s Statement of Material Facts; Defs.' Statement of Material Facts; Pl.'s Response to Defs.' Statement of Material Facts.  The parties' dispute turns on questions of law, not fact.  And because defendants are correct that compensating the Tribe for both principal and interest payments and depreciation would violate 25 C.F.R. § 900.70, the defendants are entitled to judgment as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** the defendants' cross-motion for summary judgment and **DENY** the Tribe's motion for summary judgment.  The Court will also **DENY AS MOOT** the defendants' motion to dismiss.

A separate Order consistent with this Memorandum Opinion shall issue.

Date:   2/26/24

Royce C. Lamberth
United States District Judge